BEFORE THE FIRST DIVISION, DECEMBER 12, 1946

**No. 51475.**—Petition 6285–R of American Laundry Machinery Co. (Cleveland).

COLE, Judge: The American Laundry Machinery Co. of Norwood, Ohio, imported on March 22, 1941, from its subsidiary, the Canadian Laundry Machinery Co. of West Toronto, Ontario, approximately 148 parts of a Zoric dry-cleaning unit, which were shipped under an "Invoice of Returned American Goods" (Customs Form 129), executed with the declaration that the articles "are returned without having been advanced in value or improved in condition by any process

of manufacture or other means." Said form of invoice was employed because the merchandise in question was, in fact, American goods returned, having formed part of a shipment, in 1936, by the parent corporation to its Canadian subsidiary.

The customs broker who made entry at the port of Cincinnati did so on the basis of the invoice prices, without giving any particular attention to values because the imported parts were regarded, in the light of the kind of invoice accompanying the shipment, as American manufactures and accordingly free of duty. In connection with the preparation of entry papers, the customs broker also prepared an affidavit (exhibit 1), executed by the treasurer of the importing corporation, in which the affiant testified that the imported merchandise was returned American goods that had not been advanced in value or improved in condition.

Based upon an investigation conducted subsequent to entry by customs officials, revealing that approximately 75 of the imported parts had been advanced in value and improved in condition at the Canadian plant, the customs broker prepared an amended affidavit (exhibit 2) alleging that only some of the returned merchandise remained in the same condition as when exported in 1936.

The appeal for reappraisement (reappraisement 140854–A), which had been filed following the appraiser's advances over the invoice and entered values, was decided on stipulated facts based upon the said amended affidavit, *Henry A. Wess, Inc.* v. *United States*, 8 Cust. Ct. 557, Reap. Dec. 5524, granting free entry to the items set forth in the affidavit, exhibit 2, *supra*, but sustaining the appraised values as to the remainder.

Additional duties accrued as to the merchandise on which the appraised values were affirmed, and it is for remission of such duties that the provisions of section 489, Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1489), are invoked.

James F. Allen, treasurer and director of the petitioner corporation, testified that his firm manufactures and sells laundry and dry-cleaning machinery and imports "occasionally a small machine from England or some other foreign country, and also returned parts like these from the Canadian company." The instant case is the first of its kind that his company ever had. Explaining his action executing the affidavits, exhibits 1 and 2, *supra*, the witness testified as follows (R. 17):

* * * The declaration from the Canadian company was that they [the imported parts] were in the same form as they were when received by the Canadian company. We always found that our Canadian company was very reliable and we relied on their statement. We also relied on the statement of our Cincinnati factory, but when the investigation was completed and apparently reappraisement made or appraisement made we ascertained that several parts had been advanced in value, and I therefore executed the second affidavit which apparently has been found correct by the Government. We assume it has because settlement was made on that basis.

He emphasized that as soon as it was learned that the entered values were questioned, full cooperation was given to customs officials, not only opening to them the factory records in Cincinnati and in Toronto, but also lending clerical assistance to determine the true situation.

James H. McCudden, accountant with the petitioner corporation, gave the history of the importation in question as follows (R. 27):

The parts in question, the Zoric parts—there were two sets—were shipped in 1936 to the Canadian company. One set was subsequently used. The other set was subsequently returned to the American Laundry Machinery Company in 1941. They were subsequently used to complete a new machine and shipped to one of our regular customers.

The first time the witness had knowledge of an advance in value and condition of the imported parts over their status when exported to the Canadian subsidiary

in 1936 was after entry and when customs officials "paid a visit to us to look at our cost records." The accounting records in the Cincinnati plant were not examined prior to entry because they are merely a summary of details carried in the Canadian company's factory costs, disclosing charges for each individual operation, indicating the kind of work performed. In transferring such costs to the Cincinnati parent company, only the total amount expended on each item is shown, so it was necessary to go to the Canadian plant where "I went over all the records, and I found that the figures and facts given by the customs officials were correct; certain of these parts had been machined." The oral testimony was confirmed by accounting records, produced in open court, from which the witness supplied figures indicating labor, overhead, and material costs in Canada on the machine parts that had been advanced in value by the appraiser. It was admitted that the records of the petitioner corporation actually showed, at the time of entry, that work had been done on the machine parts in question, but it was necessary to examine, first, the Canadian factory costs to determine whether the imported articles had been advanced in value because "our American records do not indicate or show whether the time was for cleaning, milling, lathing, or any other time, so we have to go back to our original Canadian records to get those details" (R. 31). The witness stated that as soon as he learned the facts from his examination of the Canadian records, he "promptly reported" them in a letter to the customs agent who acknowledged appreciation for "the cooperation you have accorded in this matter," collective exhibit 5.

Interrogated by the court concerning the affidavits, exhibits 1 and 2, *supra,* the witness testified that he gathered the data embodied in the second affidavit, exhibit 2, and he supported the action taken by the affiant in the first affidavit, exhibit 1, stating that "Mr. Allen, being a top executive, cannot possibly examine and scrutinize all of these details in every paper that comes to him for signature," but "has to rely on the ability and integrity of other persons for these things" (R. 44 and 45), and added further, "Mr. Allen relied upon our broker to check with him, in this case, because we have a broker who handles these matters."

Robert James Morrow, vice president and treasurer of the Canadian exporter, who was familiar with accounting procedures prevailing in the parent corporation as well as those of his own company, corroborated the testimony of the previous witness so far as it related to the factory costs maintained by both companies. He directed that "the goods should be sent back at the same price at which we received them at the time of importation, irrespective of any change in value," having no information that the merchandise in question had been machined or advanced in value because "my understanding was that one set of parts had been machined for the machine we had sold in the factory. It must have been a voluntary proposition when they machined the other parts. They didn't do it under any order." The witness further testified that at the time of the present shipment, 80 percent of the shops of the Canadian company was engaged in war industries; labor conditions were exceedingly difficult; the personnel staff was depleted so that employees were required to work nights and assist in different departments; and controls were such that the organization was disrupted. When the Canadian exporter was advised by customs officials that there was a difference between "the certified invoice and the cost records," the customs department of the said exporter began checking accounting records so all data would be available when the investigation was made by the United States customs agent. The witness characterized the use of the "Invoice of Returned American Goods," showing original values for the shipment, as a "mistake" that "would not have occurred, except for the long time [5 years] that elapsed between the time when they were imported into Canada and when they were returned."

Responsibility for the kind of invoice used and return of the machine parts in question lay with the customs clerk employed by the Canadian subsidiary, who testified that he went down to the stock room and drew the parts, making a "rather cursory examination" of "maybe thirty or forty of them" to make sure that they were the right ones, rather than to determine if they had been further manufactured since their receipt in 1936. Some of the parts were rusty; others had corroded to an extent. His reasons for not consulting the cost department were "because at that time, in 1941, we were particularly involved in the war effort," and "I was working three nights a week to try and keep up with my own job and do the extra duties in the office." He further testified that "under normal circumstances" the under-valuation, as it occurred in the present case, would not have happened because "it could have been looked into thoroughly." It never occurred to him that the machine parts in question had been advanced in Canada from the condition as received. This was the first case where such a condition was found to exist.

Counsel for respondent, in their brief, have cited several cases where a petition, filed under the provisions of section 489, *supra*, was denied. The conclusion in each of those cases, however, was based upon facts and circumstances materially different from those before us.

Ordinarily, the existence of war, and its consequences on industrial organization, so glaringly displayed herein, are not entitled to much consideration in the disposition of a petition like the one under consideration. The instant case, however, presents most unusual circumstances, developed, in a large part, through the war activities of the petitioner corporation and its foreign subsidiary. At the time of shipment, entry, and appraisement of the instant merchandise, substantially all production of the American importer and the Canadian exporter was connected with the prosecution of the war effort. The volume of work prevailing then, and the speed in which it necessarily had to be accomplished, obviously created business disturbances and organization deficiencies that did not exist during the normal routine of their affairs. It is easily conceivable that everyone connected with the two companies was working under heavy pressure and great tension, so it becomes quite comprehensible how, under such abnormal working conditions, mistakes occurred, as they did in different phases of the transaction under consideration.

The writer conducted the trial of this case at Cincinnati and observed, from the attitude of the witnesses, a willingness to present to the court a complete set of facts for a proper disposition of the issues. Their presence on the witness stand was thoroughly contradictory to anything indicative of an attempt to defraud the Government or deceive the appraiser in entering the instant merchandise at values lower than those at which it was finally appraised.

"It is, of course, true that the issue must be determined upon the question of intent at the time of entry, but, for the purpose of throwing light upon the matter of intent, the conduct of the petitioner in direct relation to the subject matter, before and subsequent to the entry, may be looked to." *United States* v. *Pennsylvania Salt Manufacturing Co.*, 26 C. C. P. A. 232, C. A. D. 22. The record herein is thoroughly convincing that petitioner, immediately upon learning that its entered values were questioned by the appraiser, gave the fullest degree of cooperation to customs officials toward a determination of the true condition of the imported merchandise and the correct values thereof. The original affidavit, exhibit 1, *supra*, was entirely ignored upon execution of the amended affidavit, exhibit 2, *supra*, which became the basis for all subsequent actions, including a final appraisement, giving rise to the present proceedings.

On the record before us, and giving full consideration to the extraordinary conditions existing at the time in question, we are satisfied that the petitioner is entitled to the relief requested.

The petition is therefore granted and judgment will be rendered accordingly.